**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| CANAL INDEMNITY COMPANY, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:19-cv-02945 |
| COASTAL TRANSPORT CO., INC., et al. | § § | |
| Defendants. | § § | |

**DECLARATION OF BRETT J. YOUNG, ESQ. IN SUPPORT OF
PHILLIPS 66 COMPANY'S MOTION FOR SUMMARY JUDGMENT AGAINST
PLAINTIFF CANAL INDEMNITY COMPANY**

I, Brett J. Young, declare:

1.      My name is Brett J. Young and I am over the age of 21 years.  I have personal knowledge of the facts stated in this Declaration.

2.      I am a partner at Norton Rose Fulbright US LLP ("Norton Rose"), where my trial practice focuses on toxic tort, catastrophic injury, and environmental litigation on behalf of my clients, which primarily are in the energy industry.  I have over 17 years of experience defending energy companies in these types of lawsuits (May 2003 law school graduate).

3.      I have defended clients in hundreds of toxic tort and product liability cases where it is alleged that exposure to a certain chemical or agent caused illness.  I have defended such cases in state and federal court, and in a variety of states that apply different legal principles (e.g., California, Washington, Nevada, Arizona, Utah, Colorado, Oklahoma, Texas, Louisiana, Florida, Missouri, Illinois, Pennsylvania, New Jersey, and New York).

4.      I was engaged by Phillips 66 Company to represent ConocoPhillips Company in the lawsuit captioned *Mary Major, individually and as representative of The Estate of Elwyn*

*Webb; Joshua Webb v. SFPP, L.P., et al..* filed on March 6, 2018 in the Superior Court of

Arizona, Maricopa County ("Underlying Suit").  I defended ConocoPhillips Company ("Phillips

66") in this suit through settlement and directed all aspects of the litigation strategy.

5.      The Underlying Suit sounded in negligence and, as to Phillips 66, claims were

raised for premises liability and product liability based on the alleged failure to warn.  I have

defended refiners, terminal companies, pipeline companies, and transport companies in these

types of cases many times.

6.      I am very familiar with the plaintiffs' attorney in the Underlying Suit.  Keith

Patton and I first began working opposite one another in 2004 on a high risk benzene exposure

case that ultimately went to trial in Brazoria County, Texas.  Since then, we have been on

opposite sides of dozens of such claims, including a three-week jury trial in Clark County,

Nevada.  Mr. Patton is highly qualified, experienced, and knowledgeable on all facets of benzene

and fuels litigation.

7.      I am personally familiar with the work performed in connection with litigating the

Underlying Suit.

8.      Underlying plaintiffs developed evidence that Mr. Webb worked as a gasoline

tanker truck driver between approximately 1985 and 2015.  Through discovery in the Underlying

Suit, it was determined that Phillips 66 owned only one loading rack in Phoenix from 1997 to

2008.  A true and correct copy of Phillips 66's First Supplemental Rule 26.1 Disclosure

Statement is attached hereto as Exhibit A.

9.      At Phillips 66's request and in support of its effort to engage Canal Insurance

Company ("Canal") in Phillips 66's defense, I joined Matthew Oglesby (in house counsel for

Phillips 66) on a teleconference with Canal's representative, Alison Christian, on June 4, 2019.



During that call, I provided Ms. Christian with my evaluation of the Underlying Suit as I saw it at that time, including Phillips 66's potential liability and the challenges presented by underlying plaintiff's counsel. My recollection of this phone call is that I did a great deal of talking about the history of gasoline litigation, recent/negative development in the science, jury verdicts in similar cases, I summarized Keith Patton's experience with similar cases, and assessed the overall risk profile to Phillips 66. It was a lengthy call.

10. I also informed Ms. Christian about the experts we retained to defend the case. Specifically, we retained Dr. John Whysner, a medical doctor and scientist with a Ph.D. in biochemistry to rebut Mr. Webb's evidence that gasoline at Phillips 66's loading rack caused his cancer. A true and correct copy of Mr. Whysner's report is attached to Phillips 66's Third Supplemental Rule 26.1 Disclosure Statement in the Underlying Suit, which is attached hereto at Exhibit B.

11. We also retained Dr. Ethan A. Natelson, MD, a board-certified hematologist to rebut Mr. Webb's evidence that benzene within the gasoline at Phillips 66's loading rack caused his cancer. A true and correct copy of Dr. Natelson's report is attached to Phillips 66's Third Supplemental Rule 26.1 Disclosure Statement in the Underlying Suit, which is attached hereto at Exhibit B.

12. Finally, we retained John W. Spencer, a certified industrial hygienist and certified safety professional to provide evidence that Phillips 66's loading rack was safe, in compliance with regulatory requirements, and that Mr. Webb's exposure was not out of line with human health thresholds for either gasoline vapor or benzene. A true and correct copy of Mr. Spencer's report is attached to Phillips 66's Third Supplemental Rule 26.1 Disclosure Statement in the Underlying Suit, which is attached hereto at Exhibit B.



13.     By email dated June 10, 2019, I provided Mr. Oglesby a written evaluation of the Underlying Suit, which I now understand was forwarded to Ms. Christian on July 12, 2019.  My June 10 evaluation summarized much of the information that I provided Ms. Christian in our telephone call of June 4, 2019.  A true and correct copy of my June 10, 2019 email is attached hereto at Exhibit C.

14.     As stated in my June 10, 2019 email, the underlying plaintiffs' strategy was to differentiate among defendants based on their safety policies, procedures, and gasoline warnings.

15.     The underlying plaintiffs' attorney focused on the differences between the defendants' safety policies and procedures to his advantage.  These discrepancies were temporal (i.e., how things changed at specific terminals over time).  But more importantly, these differences existed across different business units within a given company (e.g., refinery policies were more strict than policies at loading racks) and those discrepancies were highlighted for maximum effect.

16.     Our strategy, in general, was to present favorable witness evidence that Phillips 66's loading rack was safe and fully compliant with all local, state, and federal regulations.

17.     I had concerns that the underlying plaintiffs would focus on "dome outs" because our internal documents had recorded such events in the past.  A "dome out" occurs when fuel comes out from the top of a tanker because the tanker is filled beyond its capacity.  Phillips 66's witnesses testified (and documents supported the fact) that driver error could result in "dome outs," but no evidence was developed that Mr. Webb experienced this phenomenon while he was loading at the Phillips 66 terminal.  This would have been a hotly contested and central fact issue at the trial.



18.     No evidence was developed in the Underlying Suit that the storage tanks (located near the loading racks), which hold the gasoline before it is loaded into tanker trucks, ever leaked.

19.     There was also no evidence that Phillips 66's loading rack vapor recovery unit ever failed. *while Mr. Webb was loading.* (bj) In fact, the evidence showed that the loading rack would shut down automatically if there was an equipment failure or malfunction with the vapor recovery system.  We considered this one of our better facts.

20.     At trial, the underlying plaintiffs intended to prove the allocation of time and exposure at each defendants' loading rack through co-worker testimony, work records, social security earnings records, bills of lading, access card agreements, and other similar qualitative evidence.   If the defendants were forced to fight over some kind of "allocation," we would essentially be making the underlying plaintiffs' "exposure" case for them, while still being subject to a share of the overall liability.  As we have learned from prior focus group and mock jury exercises, it is inconsistent to focus on the amount of "time" a plaintiff spent at another loading rack *if* your baseline defense is that there is no injurious exposure at a loading rack in the first place. Stated differently, these cases are lost immediately by adopting an asbestos-style defense approach.

21.     Phillips 66's strategy was straightforward.  We sought to avoid becoming a target defendant by highlighting the 1997 to 2008 exposure time period, which occurred during the modern era of rack technology.  Phillips 66's strategy was to use favorable witness testimony regarding its policies and procedures to run a safe and clean loading rack, coupled with industrial hygiene data from its loading rack and others that were of similar age and function.  Lastly, if forced to make the argument that Mr. Webb understood the risks of being exposed to gasoline



vapor, Phillips 66 was prepared to argue that its material data safety sheets provided adequate warnings of the potential harms from gasoline exposure (probably more than adequate).

22.    Based on the case being developed by the underlying plaintiffs, at the time I performed my evaluation, which was before any experts were deposed, I estimated a negative jury verdict in the range of $5 million to $8 million against all of the defendants, with an allocation to Phillips 66 in the 10% to 50% range, or at least $500,000 to $2.5 million.  While that would be a bad result, and in my estimation an unfair result based on the law and facts, it would not have been unusual for a death case against an oil company defendant.  Several such verdicts have been rendered in benzene litigation in the past ten years.

23.    At the time Phillips 66 began negotiating settlement with the underlying plaintiffs, the risk profile was at its lowest point for Phillips 66 because (1) expert discovery had not yet targeted Phillips 66 and (2) because Keith Patton had decided (and told me) that other defendants were less prepared to put on a trial defense.

24.    If Phillips 66 elected to continue on with the litigation, I estimated the cost at approximately $40,000 to $75,000 per month.  I also concluded that if the case went to trial, Phillips 66 would have to take the lead on experts to best protect Phillips 66 from liability, leading to even higher trial costs.

25.    In my estimation, the cost of litigating this toxic tort death case through trial would have exceeded $300,000 in lawyer time.  Expert fees would have been in addition to that.

26.    Despite a demand from underlying plaintiffs for $650,000 to settle the case, I believed the case could be settled for significantly less based on my experience with Keith Patton.

27.     Ultimately, Phillips 66 settled the claim for far less than the cost of litigating the case through trial.

28.     I am competent and qualified to make this declaration pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that the foregoing is true and correct.

29.     Should my Declaration be used in any future proceeding, I respectfully request the opportunity to fill in any gaps or questions the Court may have.

Executed on December 15, 2020 in Harris
County, Texas

_____
Brett J. Young, Esq.