# EXHIBIT C TO YOUNG DECL.

| | |
|---|---|
| **From:** | Young, Brett J. <brett.young@nortonrosefulbright.com> |
| **Sent:** | Monday, June 10, 2019 2:45 PM |
| **To:** | Oglesby, Matt H (LDZX) |
| **Cc:** | Rutledge, Brad; Young, Brett J. |
| **Subject:** | [EXTERNAL]core attorney work product // attorney client privileged communication |

Matt-

You have asked me to prepare an analysis of verdict risk and litigation expense going forward in the *Major* case. The *Daubert*/702 analysis on specific causation will come separately after Brad has pulled the controlling case law in Arizona. Below is my analysis of the impact of recent fact witness depositions, document productions, and co-defendant developments, as well as projected fees and expenses for the remainder of 2019.

## OVERVIEW
Keith has stayed in the lane in his workup of this case. For those defendants who have policies and procedures at refining/marine assets that are different from the policies and procedures at their loading racks, Keith is exposing that difference and is using it to his strong advantage. He did this to KM in the *Lewis* case, and has done it to both Chevron and KM in the instant matter. He is also slowly working from the outside in: starting with "fact" witnesses who have knowledge of the various loading racks, getting basic information and admissions in the record, and follow with corporate representative depositions in the summer and fall. His experts have taken fairly reasonable positions on the facts and literature. In short, this is not a desperate lawyer with a bad case. Discovery ends in November.

## ASSESSMENT
The liability claim is that from 1997-2008, Mr. Webb loaded motor fuels at the Tosco/COP Phoenix, Arizona terminal and was allegedly exposed to benzene in the process. The exposure assessment performed by Plaintiff's expert neither references our rack nor puts a defendant-specific dose figure on our rack (we still believe that Kinder Morgan is his target defendant, and the emphasis his dose expert put on the Kinder Morgan terminal supports this view). So, based on the existing crop of defendants, we believe that we fall into the second tier. Plaintiff has no direct evidence that Webb ever actually loaded fuels at our terminal, but will marshal co-worker testimony saying that he did. There is no evidence to support the frequency of Webb's alleged loading activity at our terminal (*e.g.*, there are no bills of lading or access records putting Webb at our terminal).

Two former Tosco/COP employees were deposed last week. Doug Kleopfer (terminal manager 1999-2000) and Dennis Gilmore (terminal manager 2001-2008). Both witnesses performed well and it is clear that we had policies and procedures in place to run a clean and safe loading rack. The part of our story that I was the most concerned about (dome outs) was handled well by our witnesses. With a few former drivers and our corporate industrial hygienist as trial witnesses, we would have a good story to tell about minimizing/preventing exposures at our loading rack.

Unfortunately, our own material safety data sheets for unleaded gasoline from the early 2000s (2001, 2002, and others) identify the product as a human carcinogen. This carcinogen notation is a

1

misunderstanding of the regulatory requirements under the Hazard Communication Standard and should never have been included (as explained later on the sheets themselves), but no amount of spin will mitigate the fact that, as to us, <u>the general causation battle will be lost in front of the jury</u>. It is hard to conceive of a more damaging document in the defense of a gasoline case and it will used to defeat a general causation MSJ.  On the bright side, if the jury believes that gasoline is a human carcinogen, we can use our MSDS to try and satisfy our warnings burden based on testimony from the Coastal safety representatives (*i.*e., they provided loading rack MSDS to their drivers).  Exxon successfully did this in a New Jersey gasoline case two years ago where the jury found causation was present, but held for the defendant (Exxon) because Plaintiff failed to prove that Exxon did not sufficiently warn the driver.  We could take the position that there is not nearly enough exposure at our racks for drivers to get cancer, but we warned of all known possible risks.

The high end verdict range in this case is $5-8MM.  If we were allocated 10% of that, then our verdict risk is a modest $500k.  If we were allocated half, obviously, our verdict risk would be much higher.  The lawyer fees on this case will run in the $40-75k range, per month, for the rest of 2019.  Additionally, we will be required to pay our share of expert fees once the pool of defense dollars is used up.

If we try this case in 2020, Phillips 66 will likely be co-defendants with one or more of the tier one targets (Cal-Jet, KM, Pro Petroleum).  I like their lawyers personally and believe they are competent advocates, but we would have to take the lead to protect P66.  That may be a good thing for you (low fault allocation, shared expenses, etc.), but it also means that our involvement on the lawyering side will feel a lot more like we are the target.  I would need to direct all three of our experts at trial and cross Robert Harrison (their causation expert) and Rachel Jones (their IH).  That would be a lot of work, which you would be paying for.

As you know, the epidemiological literature on benzene and MDS (and gasoline and MDS) is no longer a strong suit for defendants.  Once upon a time, we could say there were "no studies" that report a statistically significant association between exposure to gasoline and MDS.  We cannot say that anymore.  And, once upon a time we could say there were "no studies" that report a statistically significant association between low-dose benzene exposure and MDS.  We cannot say that anymore.  The Rachel Jones dose assessment has a cumulative exposure of ~3ppm years, which is slightly higher than the lowest end of the range of benzene-MDS associations from the *Schnatter et al*. pooled analysis.  Plaintiff will argue that Webb had enough exposure to cause his MDS and will point to the (industry-sponsored) *Schnatter et al*. pooled analysis to support that statement.  Our rebuttal will be that the totality of the medical and scientific literature does not support either general or specific causation.

Finally, our view is that defendant-specific dose assessments are necessary to satisfy Plaintiff's specific causation burden of proof, but that is by no means clear under Arizona law.  If the Court accepts the argument that Webb's cumulative exposure to benzene over 30 years is all that matters and, because this is an indivisible injury, there is no requirement that Plaintiff put on a "dose case" as to each trial defendant, then we will have to either (1) win the general causation battle at trial, and/or (2) win the argument that low-dose benzene exposure does not cause MDS.  That is a 50-50 proposition at best.

## **RESOLUTION OPTION**

I believe we could settle this case for $250k.  I do not know that for sure, but I have resolved enough cases with Patton to put brackets around what his $650k demand means.  Please do not accept this report as an endorsement of resolving the case for $250k.  I am just giving you my best estimate at this stage of the case.

**Brett J. Young** | Partner
Norton Rose Fulbright US LLP
1301 McKinney, Suite 5100, Houston, Texas  77010-3095, United States
Tel +1 713 651 5337 | Fax 7136515246
brett.young@nortonrosefulbright.com

### NORTON ROSE FULBRIGHT

*Law around the world*
nortonrosefulbright.com

**CONFIDENTIALITY NOTICE:** This email, including any attachments, is confidential and may be privileged. If you are not the intended recipient please notify the sender immediately, and please delete it; you should not copy it or use it for any purpose or disclose its contents to any other person. Norton Rose Fulbright entities reserve the right to monitor all email communications through their networks.

Norton Rose Fulbright Australia, Norton Rose Fulbright LLP, Norton Rose Fulbright Canada LLP, Norton Rose Fulbright South Africa Inc and Norton Rose Fulbright US LLP are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.